UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| SARAH CALLAGHAN,<br><br>PLAINTIFF<br><br>v.<br><br>INTERSECTIONS, INC. D/B/A AURA COMPANY<br><br>DEFENDANT. | Civil Action No. 1:21-CV-00263<br><br>COMPLAINT FOR DAMAGES<br>TITLE II OF THE ADA<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Sarah Callaghan submits the following Complaint against Defendant Intersections, Inc. d/b/a Aura Company ("Aura" or "Defendant") for disability discrimination and retaliation under Title II of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12111, et seq.

## PARTIES

1. Sarah Callaghan is an individual domiciled in Virginia Beach, Virginia.

2. Aura is a stock corporation organized under Virginia law with a principal place of business in Burlington, Massachusetts. Aura is engaged in an industry affecting commerce and employed 15 or more employees for 20 or more calendar workweeks in each calendar year during which Callaghan was employed.

## JURISDICTION & VENUE

3. This Court has subject matter jurisdiction over Callaghan's claims pursuant to 28 U.S.C. § 1331.

4. Venue is proper in this Court pursuant to 42 U.S.C. §§ 12117(a) and 2000e-5(f)(3)

1

because it is a judicial district in which the unlawful employment practices are alleged to have been committed and a judicial district in which the employment records relevant to such practices are maintained and administered.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. On May 18, 2020, Callaghan filed a charge of discrimination against Aura with the Equal Employment Opportunity Commission ("EEOC") asserting claims of disability discrimination and retaliation under the ADA.

6. On January 14, 2021, the EEOC issued to Callaghan a Notice of Right to Sue on her ADA claims at Ms. Callaghan's request.

7. Accordingly, Callaghan has exhausted her administrative remedies with respect to these claims.

## FACTUAL ALLEGATIONS

### Aura recruits Callaghan to rework its marketing division

8. Defendant Aura is a technology company that provides data security services to customers through a variety of digital platforms.

9. Sarah Callaghan was recruited and hired by Aura in the summer of 2019 as a Senior Marketing Director.

10. Though Aura's headquarters is located in Burlington, Massachusetts, Aura allowed Callaghan to work out of its satellite office in Chantilly, Virginia so that Callaghan could be closer to her home.

11. Upon joining Aura, Callaghan already had more than a decade of marketing experience, including work as a Global Marketing Manager for a leading business-to-business learning and development organization where she had earned several internal and external awards.

12. Because of her experience and demonstrated marketing expertise, Aura hired Callaghan to essentially rework and modernize its marketing department.

13. Within her first several weeks at Aura, Callaghan observed a number of problems with some of the personnel on the marketing team. Based on her observations, she concluded that she may not be a good fit at Aura and notified Hamad Saeed, the Chief Operating Officer, and Jeanne Gray, the Director of Human Resources, that she intended to resign.

14. Impressed by her astute observations about the marketing team, Saeed and Gray urged Callaghan to remain at Aura and advised her that she could make personnel cuts and customize the marketing team as she saw fit.

15. After some deliberation, Callaghan accepted Saeed and Gray's invitation to continue working at Aura.

**Callaghan is praised for making substantial improvements to Aura's marketing department**

16. Shortly after stepping into her role as Marketing Director, Callaghan began to make revisions to Aura's marketing department consistent with the expectations that Saeed and others had expressed while recruiting her.

17. Among other things, Callaghan: (1) updated Aura's marketing collateral; (2) modernized company branding; (3) oversaw the creation of new standard sales proposals; (4) supervised the production of technology solutions to assist the sales team; and (5) introduced a new marketing project management tool.

18. In addition, Callaghan recruited a new marketing team to help facilitate these changes.

19. Within months, Callaghan's changes had yielded noticeable improvements in Aura's marketing department.

20. For example, in or around August or September 2019, Callaghan coordinated a joint campaign between the marketing team and the sales team—two teams that had only functioned independently in the past—to secure a multi-million-dollar deal with a major telecommunications company.

21. Both Aura employees and executives routinely credited and praised Callaghan for the improvements to the marketing division.

22. Saeed was particularly impressed by Callaghan's accomplishments. He regularly spoke to Callaghan and other Aura employees and executives about her value to the company.

23. Moreover, in or around August 2019 Saeed openly praised Callaghan in front of the entire executive team during a presentation on some of her marketing initiatives.

**Saeed encourages Callaghan to move to Aura's headquarters and offers Callaghan a substantial raise**

24. In or around the fall of 2019, Saeed began to encourage Callaghan to move to Massachusetts to work out of Aura's headquarters in Burlington.

25. On October 4, 2019, Saeed presented Callaghan with a relocation package by which he offered her a more than 20% raise, a $10,000 incentive bonus, and moving expenses. When Saeed learned that Callaghan's husband was uneasy about the proposed move, Saeed even mentioned throwing in a country club membership because he knew that Callaghan's husband liked to golf.

26. A few days later, Callaghan accepted the relocation package, and her move was scheduled for November 11, 2019.

**Saeed learns about Callaghan's disability and begins to treat her differently**

27. On October 12, 2019, days after receiving the relocation package, Callaghan experienced an epileptic seizure and hit her head on a desk, causing a concussion.

28. Callaghan was hospitalized, and her husband notified Aura about her condition.

29. On October 16, 2019, Callaghan returned to work. Upon her return, she notified Saeed and Gray, for the first time, that she had a history of epilepsy.

30. At or around this time, Callaghan informed Mr. Saeed that her epilepsy was under control and that it would not interfere with her ability to perform the essential functions of her job.

31. Within days, however, Callaghan noticed a distinct change in Saeed's attitude toward her.

32. For example, during a discussion about an upcoming 360-degree feedback session, Saeed inexplicably told Callaghan that he was "surprised" that feedback from her team members was so positive.

33. Around this time, Saeed also began to copy Callaghan's subordinates on emails.

34. In another example, on October 31, 2019, Saeed was openly hostile and dismissive with Callaghan on a conference call with a number of her colleagues and team members. Saeed's hostility was so evident during the call that one of Callaghan's team members followed up with Callaghan afterwards to make sure that she was okay.

35. Later that afternoon, Callaghan had a one-on-one meeting with Saeed during which he explicitly asked her about her seizure and whether it was caused by stress. Though Callaghan tried to change the subject, Saeed pushed further, asking her if her job was casing the stress. Later during the conversation, Saeed told Callahan that she needed to "think about [her] role at Aura." He told her that she needed to "ask" rather than "tell" the senior sales employees how to do marketing because they were "senior f***ing guys" who were "a few steps above [her]." He further told her that she needed to "know [her] place."

36. Callaghan was surprised by these comments because she had routinely received

positive feedback from both Saeed and the sales team in the past.

**Aura terminates Callaghan's employment because of her disability and retaliates against her for objecting to disability discrimination**

37. On November 7, 2019, Callaghan participated in a conference call with Gray and Saeed to discuss Callaghan's 360-degree feedback from colleagues—feedback that Saeed had already told her was positive.

38. When the meeting began, however, Saeed told Callaghan that there was a more important topic to discuss. He told her that she did not seem happy in her role and that the business had changed since she had been hired.

39. Saeed and Gray then told Callaghan that they were going to "be nice" and allow her to remain with the company until the end of March 2020 so that she could help with hiring and training. They further told Callaghan that they were trying to "be kind" because of her "situation."

40. On the following day, Callaghan participated in another conference call with Saeed and Gray at which point Callaghan asked for a more specific reason for her termination. During the conversation, Callaghan expressed that she felt there was a connection between her seizure and the termination. Gray denied that there was such a connection. Callaghan continued that she was struggling to disconnect the two topics, but Gray cutoff Callaghan while she was speaking and said that if she wanted to continue to discuss that issue, Aura would have to rescind their offer to allow her to work until the end of March.

41. Shortly after this meeting, Callaghan contacted Jessica French, Aura's Senior Human Resources Manager who reports to Gray, and requested to file a complaint about disability discrimination. During this conversation, Callaghan described her conversations with Saeed and Gray over the prior two days and indicated that she felt that she was being discriminated against on the basis of her epilepsy.

42. Later that night, Saeed attempted to contact Callaghan at an uncharacteristically late hour, but she was unable to speak with him that time.

43. Gray also attempted to coordinate a time to speak with Callaghan over the weekend, but Gray later cancelled that appointment.

44. On November 12, 2019 Gray emailed Callaghan and stated, in pertinent part:

> After reviewing our conversations from [November 7 and 8], it's clear that the best path forward is an immediate parting of ways. We'd sincerely hoped that the longer working transition into 2020 would have worked out.
>
> Your access to our systems has been terminated. Jessica French . . . will follow up with details regarding the severance offer, which is subject to a signed release.

45. This email terminated Callaghan's employment with Aura.

## COUNT I—DISABILITY DISCRIMINATION
### (Americans with Disabilities Act)

46. Callaghan incorporates the preceding paragraphs by reference.

47. Aura is a an "covered entity" within the meaning of 42 U.S.C. § 12111(2).

48. At all relevant times, Callaghan was a qualified individual with a disability within the meaning of 42 U.S.C. §§ 12102 and 12111(8).

49. During her tenure at Aura, Callahan consistently performed her job at a level that met or exceed Aura's expectations.

50. Notwithstanding Callaghan's performance, Aura took adverse action against her including, but not necessarily limited to, terminating her employment.

51. Aura took adverse action against Callaghan on the basis of her disability.

52. Aura's actions were intentional and with malice or otherwise reckless indifference to Callaghan's rights to be free from disability discrimination under 42 U.S.C. § 12111.

53. As a direct and proximate result of Aura's discrimination, Callaghan has suffered

substantial damages.

## COUNT II—RETALIATION
### (Americans with Disabilities Act)

54. Callaghan incorporates the preceding paragraphs by reference.

55. Aura is a "covered entity" within the meaning of 42 U.S.C. § 12111(2)

56. At all relevant times, Callaghan was a qualified individual with a disability within the meaning of 42 U.S.C. 12102 and 12111(8).

57. Callaghan engaged in protected activity under the ADA when she complained to Aura about protected activity, including, without limitation, the occasions identified in Paragraphs 40 and 41.

58. Aura took a series of adverse actions against Callaghan for engaging in protected activity, including, without limitation: i) withdrawing an offer to allow her to continue to work at Aura until at least the end of March 2020 and ii) terminating her employment.

59. But for Callaghan's disability, Aura would not have taken the above-described adverse actions against her.

60. Furthermore, Aura's actions were intentional and with malice or otherwise reckless indifference to Callaghan's right to be free from retaliation under the ADA.

61. As a direct and proximate result of Aura's retaliation, Callaghan has suffered substantial damages.

## PRAYER FOR RELIEF

62. WHEREFORE, Callaghan respectfully requests that the Court entered judgment in her favor granting her legal and equitable relief as the Court may deem just, including, but not limited to

   a. front and back pay;

b. compensatory damages;

c. punitive damages;

d. liquidated damages;

e. reasonable attorneys' fees and costs; and

f. any other relief to which Callaghan is entitled by law and which the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Sarah Callaghan demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: [ ]

Respectfully submitted,

/s/
Ben D. Johnson (VSB No. 90812)
PIERCE MCCOY, PLLC
313 East Broad St., Suite 315
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: (757) 257-0387
bjohnson@piercemccoy.com

Joshua L. Jewett (VSB No. 76884)
PIERCE MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Tel: (757) 901-4382
Fax: (757) 257-0387
jjewett@piercemccoy.com

*Counsel for Plaintiff Sarah Callaghan*